■ JUN CHI GUAN et al., Plaintiffs, and SHAO ZHEN KWAN, Respondent, v TUSCAN DAIRY FARMS, Doing Business as DELLWOOD DAIRIES, et al., Appellants, et al., Defendants. [806 NYS2d 713]—

In a consolidated action, inter alia, to recover damages for personal injuries and wrongful death, etc., the defendants Tuscan Dairy Farms, doing business as Dellwood Dairies, and William Piro appeal from so much of an order of the Supreme Court, Kings County (Douglas, J.), dated September 16, 2004, as denied that branch of their motion which was for summary judgment dismissing the third cause of action in the complaint interposed in the action originally commenced under index No. 25874/98 insofar as asserted against them.

Ordered that the order is reversed insofar as appealed from, on the law, with costs, that branch of the motion which was for summary judgment dismissing the third cause of action in the complaint interposed in the action originally commenced under index No. 25874/98 is granted, that cause of action is dismissed insofar as asserted against the appellants, and that cause of action is severed insofar as asserted against the remaining defendants.

This consolidated action, inter alia, to recover damages for personal injuries and wrongful death arises from an accident wherein a delivery truck owned by the defendant Tuscan Dairy Farms, doing business as Dellwood Dairies, and driven by the defendant William Piro (hereinafter referred to collectively as the appellants), allegedly struck the plaintiff Shao Zhen Kwan (hereinafter the plaintiff) as she was pushing a stroller conveying her two-year-old grandson, the decedent Jackie Guan (hereinafter the infant). The impact allegedly caused the plaintiff to sustain serious physical injuries and caused the infant's death. The Supreme Court denied that branch of the appellants' motion which was for summary judgment dismissing the third

cause of action in the complaint interposed in the action originally commenced under index No. 25874/98 insofar as asserted against them, which sought to recover damages for injuries the plaintiff allegedly sustained from observing the accident in which the infant was killed. We reverse.

It is now settled that "where a defendant negligently exposes a plaintiff to an unreasonable risk of bodily injury or death, the plaintiff may recover, as a proper element of his or her damages, damages for injuries suffered in consequence of the observation of the serious injury or death of a member of his or her immediate family—assuming, of course, that it is established that the defendant's conduct was a substantial factor bringing about such injury or death" (*Bovsun v Sanperi*, 61 NY2d 219, 230-231 [1984]). Here, the plaintiff argues that, given the culture of the Chinese family, which resulted in her being the person who was with the infant during most of his waking hours, the infant was within the infant's "immediate family." However, we are not writing on a clean slate. The Court of Appeals has exercised its prerogative to balance the competing interests and announce the public policy of this state to limit liability to the class of persons identified as "immediate family" in *Bovsun* (*supra* at 230-231). This class of persons does not include a plaintiff's grandson, and it is not appropriate for this Court to expand the class absent further direction from the Court of Appeals or the New York State Legislature.

In *Bovsun v Sanperi* (*supra*), the Court of Appeals announced the availability of bystander recovery in this state in two cases brought by the spouses, parents, and/or children of the injured or deceased person. In a footnote, the Court stated: "Inasmuch as all plaintiffs in these cases were married or related in the first degree of consanguinity to the injured or deceased person, we need not now decide where lie the outer limits of 'the immediate family.' " (*Id.* at 234 n 13.)

In *Trombetta v Conkling* (82 NY2d 549 [1993]), the Court of Appeals was asked to find that an aunt was within the "immediate family" of the plaintiff niece. The plaintiff in *Trombetta* was seeking to recover damages for emotional injuries she allegedly suffered witnessing her aunt being run over and killed by a tractor-trailer. The plaintiff argued that her aunt should be considered her "immediate family" given their familial relationship and the close emotional bond she had shared with her aunt, who had become her maternal figure after her mother died. In rejecting this argument, the Court of Appeals noted that *Bovsun* "opened a narrow avenue" to a "very circumscribed right of recovery" (*Trombetta*, 82 NY2d 549, 552 [1993]). The Court

held: "On firm public policy grounds, we are persuaded that we should not expand the cause of action for emotional injuries to all bystanders who may be able to demonstrate a blood relationship coupled with significant emotional attachment or the equivalent of an intimate, immediate familial bond." (*Id.* at 553.) The Court continued: "It remains part of this Court's important common-law tradition and responsibility to define the orbits of duty. Sound policy and strong precedents justify our confinement and circumscription of the zone of danger rule to only the immediate family as surveyed in *Bovsun*" (*id.* at 553). Finally, the Court noted: "As a policy matter, we continue to balance the competing interests at stake by limiting the availability of recovery for the negligent infliction of emotional distress to a strictly and objectively defined class of bystanders. In addition to the prevention of an unmanageable proliferation of such claims—with their own proof problems and potentiality for inappropriate claims—the restriction of this cause of action to a discrete [and] readily determinable class also takes cognizance of the complex responsibility that would be imposed on the courts in this area to assess an enormous range and array of emotional ties of, at times, an attenuated or easily embroidered nature." (*Id.* at 554-555.)

The case at bar is analogous to *Trombetta*, and the expansion of the class sought must be denied on the same rationale. Here, as in *Trombetta*, the plaintiff is arguing that a blood relationship, coupled with a significant emotional attachment and intimate, immediate familial bond, gave rise to an "immediate family" relation in the form of a de facto maternal figure (albeit here the status of the plaintiff is that of the de facto maternal figure, whereas in *Trombetta* it was the contrary). This argument was rejected in *Trombetta* and must be rejected here. Indeed, the argument is even less compelling in the case at bar. Here, unlike in *Trombetta*, the infant's mother was not deceased at the time of the accident. In sum, the class of persons in a plaintiff's "immediate family" does not include his or her grandchild. Ritter, Goldstein and Lifson, JJ., concur.

S. Miller, J.P., dissents and votes to affirm the order insofar as appealed from with the following memorandum: My colleagues have concluded that binding precedent from our Court of Appeals precludes a finding that the plaintiff Shao Zhen Kwan is a member of her grandson's "immediate family" for the purpose of permitting her to maintain a cause of action for her emotional injuries sustained as a result of her having witnessed the tragic death of her grandson. I do not agree that such a conclusion is contrary to established precedent. Moreover, I find that the

plaintiff grandmother was, as a matter of fact, a part of her grandson's immediate family, and that the governing rationale to limit the availability of damages to such immediate family members is by no means compromised by recognizing the plaintiff grandmother's immediate family status. Accordingly, I dissent.

The plaintiffs' decedent, Jackie Guan, age $2^1/_2$, was being pushed in his stroller by his grandmother, the plaintiff Shao Zhen Kwan (hereinafter the plaintiff grandmother), at a Brooklyn street fair when both were allegedly struck by a truck owned by the defendant Tuscan Dairy Farms, doing business as Dellwood Dairies, and driven by the defendant William Piro (hereinafter the appellants). The truck crushed the stroller and the child, causing his death. Simultaneously the plaintiff grandmother was thrown into the air and knocked into partial unconsciousness. She sustained a fractured thigh and other serious but nonfatal injuries. It was the plaintiff grandmother's daily routine to care for her grandson from 7:00 A.M. to 7:00-8:00 P.M. while his parents worked. She had quit her job as a garment factory worker in 1995 to be available to provide full-time care for her grandson six days of every week.

In the ensuing action, the plaintiff grandmother sought, inter alia, damages for her own physical injuries and for her "psychic injuries and/or mental anguish." Insofar as these claims included psychological injuries she sustained from witnessing the death of her grandson, the appellants moved for summary judgment dismissing these claims contending that she was not entitled to recovery since she was not a member of the child's "immediate family." They also argued that because she was knocked unconscious she did not actually witness her grandson's death and was therefore barred from recovery under New York law. The Supreme Court denied the appellants' motion.

The state of the law in New York prior to 1984 was that there was no recovery for emotional harm suffered by a plaintiff who witnessed the death or injury of another (*see Tobin v Grossman*, 24 NY2d 609 [1969]). This rule was grounded upon policy considerations that focused primarily upon the ease with which a bystander might feign emotional injury, and upon concerns of limitless liability (*id., see* Note, *Bystander Emotional Distress: Missing an Opportunity to Strengthen the Ties that Bind*, 61 Brooklyn L Rev 1399, 1404-1406 [1995]). Thus, in *Tobin*, a mother who witnessed her two-year-old son run down by the defendant's car was denied a cause of action for the emotional distress she suffered as a result of her traumatic observations.

That rule changed in 1984 with the decision in *Bovsun v*

*Sanperi* (61 NY2d 219 [1984]). That appeal consisted of two consolidated appeals involving automobile accidents. In *Bovsun*, a father was crushed by a car as he stood behind his disabled auto on the Southern State Parkway. Although his wife and daughter did not actually see the car strike their station wagon, both were instantly aware of the impact and of the fact that the father had been injured. The companion appeal, *Kugel v Mid-Westchester Indus. Park* (61 NY2d 219 [1984]), also involved an automobile collision; there, the car occupied by the plaintiff husband and wife and their one- and four-year-old daughters, was struck by the defendant's auto. All suffered injuries and the one-year-old infant died hours later. The parents sought to recover, inter alia, for their emotional trauma in watching their infant daughter die. In both cases, the family members' claims for emotional distress were dismissed by the trial court. In both cases, the Court of Appeals reversed and sustained the claims for emotional distress resulting from the parties' observation of their family members' injury and death.

Yielding to the growing body of national authority permitting such claims, a sharply divided Court of Appeals adopted the California "zone of danger" rule holding that "where a defendant negligently exposes a plaintiff to an unreasonable risk of bodily injury or death, the plaintiff may recover, as a proper element of his or her damages, damages for injuries suffered in consequence of the observation of the serious injury or death of a member of his or her immediate family—assuming, of course, that it is established that the defendant's conduct was a substantial factor bringing about such injury or death" (*Bovsun*, 230-231). Thus the family members' claims were reinstated.

*Bovsun* makes it clear that the following elements must exist in order for a plaintiff to recover for emotional distress. First, the defendant's conduct must be negligent and must expose the plaintiff to an unreasonable risk of bodily injury or death. Merely an unreasonable risk of injury is required, not physical injury to the plaintiff. Second, the plaintiff so exposed must observe the serious injury or death of a family member. Based upon the facts of *Bovsun*, literal "witnessing" of the event is not required as the wife and daughter therein did not actually see the incident where the father was injured but were contemporaneously aware thereof. Rather, it appears that contemporary awareness rather than actual visible observation is the required element. Third, the family member whose injury or death causes the plaintiff emotional distress must be a member of the plaintiff's "immediate family."

Significantly relevant to this appeal is the *Bovsun* Court's

single reference to the meaning of the phrase "immediate family." That single reference is relegated to a mere footnote: "Inasmuch as all plaintiffs in these cases were married or related in the first degree of consanguinity to the injured or deceased person, we need not now decide where lie the outer limits of the 'immediate family.' " (*Bovsun*, 61 NY2d at 234 n 13.)

It is therefore clear beyond doubt that the Court of Appeals expressly chose not to define the term "immediate family" or to circumscribe its limits in *Bovsun*.

It was not until nine years later, in 1993, that the Court of Appeals was again presented with the opportunity to define the limits of "immediate family." In *Trombetta v Conkling* (82 NY2d 549 [1993]) a tractor-trailer struck and killed 59-year-old Phyllis Fisher as she crossed a street in Utica. Her 39-year-old niece, the plaintiff Darlene Trombetta, tried to pull her aunt to safety but was unsuccessful. Trombetta was not hit by the truck, nor did she sustain any physical injuries. Fisher had raised Trombetta since age 11 when Trombetta's mother died; there was apparently no dispute that Fisher was Trombetta's de facto mother.

Trombetta sued the driver and the owner of the truck, seeking damages for her emotional injuries in witnessing the death of her beloved aunt. The Court of Appeals held that Trombetta had no such claim. An aunt, no matter how closely bonded to the plaintiff, who had literally served as a substitute mother, could not qualify as a member of the "immediate family." Largely for the policy reasons initially cited by the *Tobin* Court, to limit liability to reasonable bounds, the *Trombetta* Court stated that: "[a]lthough plaintiff suffered a personal tragic loss, that cannot justify the significant extension of defendants' obligation to be answerable in damages for her emotional trauma. On firm public policy grounds, we are persuaded that we should not expand the cause of action for emotional injuries to all bystanders who may be able to demonstrate a blood relationship coupled with significant emotional attachment or the equivalent of an intimate, immediate familial bond" (*Trombetta*, 82 NY2d at 553). Most significantly, the Court further stated: "[s]ound policy and strong precedents justify our confinement and circumscription of the zone of danger rule to only the immediate family *as surveyed in Bovsun*" (*id*. at 553 [emphasis added]).

Contrary to the conclusion of my colleagues, I find the *Trombetta's* Court's reference to the *Bovsun* "survey" to be ambiguous, and even puzzling. As noted above, *Bovsun's* sole reference

to "immediate family" is in footnote 13 where the Court expressly declined to define the outer limits of the "immediate family." Thus, to date, the Court of Appeals has expressly refrained from providing guidance on the discrete issue we are required to determine in this case, *i.e.*, whether a grandparent is a member of the "immediate family."

Independent research confirms that no New York case has prohibited recovery of damages for emotional injuries sustained by a grandparent who witnessed the death of or injury of a grandchild or by a grandchild who witnessed the death or injury of a grandparent. Nor has any New York case permitted recovery of damages under those circumstances.

Nationally, several cases and statutes exist permitting recovery by a grandparent in the context of this litigation (*see Fernandez v Walgreen Hastings Co.*, 126 NM 263, 968 P2d 774 [1998]; *Genzer v City of Mission*, 666 SW2d 116 [Tex App 1983]) or by a grandchild (*see Dickerson v Lafferty*, 750 So 2d 432 [La Ct App 2000]; *Thomas v Schwegmann Giant Supermarket, Inc.*, 561 So 2d 992 [La Ct App 1990]; *see generally* Annotation, *Relationship Between Victim and Plaintiff-Witness as Affecting Right to Recover Under State Law for Negligent Infliction of Emotional Distress Due to Witnessing Injury to Another Where Bystander Plaintiff is Not Member of Victim's Immediate Family*, 98 ALR 5th 609, § 14). Most significantly, no authorities have been found nationally prohibiting recovery by a grandparent or a grandchild.

The special status of grandparents has long been recognized in New York statute and case law. Domestic Relations Law § 72 and the New York Court of Appeals have provided standing for grandparents seeking visitation rights with their grandchildren (*see Matter of Emanuel S. v Joseph E.*, 78 NY2d 178 [1991]). In 2000, the United States Supreme Court opined on the entitlement of grandparents to visitation when opposed by the child's parents (*see Troxel v Granville*, 530 US 57 [2000]). No other relationship is afforded such standing or consideration. Such special recognition is understandable when we consider the increasingly large numbers of grandparents who have assumed full responsibility for the care and custody of their grandchildren. According to the 2000 census published by the Census Bureau of the US Department of Commerce, over 4.5 million infants, youngsters, and teens live in households headed by a grandparent. The census points out that America's grandparents are increasingly being called upon to raise their grandchildren (*see* US Census 2000, US Department of Commerce, Statistics Administration issued October 2003; <http://www.census.gov/population/www/socdemo/grandparents.html>, cached at <http://www.courts.state.ny.us/reporter/webdocs/grandparents_grandchildren.htm>).

In 2003 New York enacted its "Grandparent Caregivers' Rights Act" (L 2003, ch 657). In so doing, the Legislature recognized: "that, with 413,000 children living in grandparent headed household in New York state, grandparents play a special role in the lives of their grandchildren and are increasingly functioning as care givers in their grandchildren['s] lives. In recognition of this critical role that many grandparents play in the lives of their grandchildren, the legislature finds it necessary to provide guidance regarding the ability of grandparents to obtain standing in custody proceedings involving their grandchildren." (L 2003, ch 657, § 1.) Currently this law is the most expansive statutory grant of rights to grandparent caregivers in any state (*see Matter of Tolbert v Scott*, 15 AD3d 493 [2005]; *see also* Wallace, *Enabling Kincaregivers to Raise Children*, New York State Kincare Coalition and AARP, New York, June 2005 [discussing the special role of grandparent caregivers]).

Although the plaintiff grandmother in this case was not the legal custodian of her deceased grandson, she served in an intimate, critical, and consistent capacity from the time of his birth, caring for him daily "in loco parentis" while his parents were both employed. There is no reason in law or equity to find that she is anyone less than a member of her grandson's "immediate family."

To the extent that concerns about limitless liability must be considered, the inclusion of grandparents does not pose that threat. Grandparents are a discreet, identifiable group and their inclusion does not infer or require that other relatives closely-bonded emotionally and practically to family members must be included as well.

Finally, I reject the appellants' contention that the plaintiff grandmother should be denied the right to recover for emotional injury because she did not actually see her grandson being hit by the truck or his body after the collision. The appellants' contention is based upon the plaintiff grandmother's deposition testimony where she stated, through the services of a Cantonese interpreter, that she suffered a state of partial unconsciousness after the impact and that she did not actually see her grandson being tossed in the air or crushed by the truck. However, in evaluating her somewhat stilted testimony, she was clearly aware that something terrible had happened, although she could not describe the details of the accident. She knew she had been hit and was "tossed up and dropped on the ground." She also knew that the stroller had been hit; she let go of it upon impact. She knew she had been pushing the stroller when the truck

knocked her unconscious. Although she was unable to identify exactly what had occurred, she knew something had happened to her grandson—that his body had been "thrown."

Virtually every time she repeated that she lost consciousness and could not provide details she also explained that she was "scared"; "I was so scared and I didn't know what happened to my grandson." Clearly the plaintiff grandmother suffered emotional trauma. She knew that she and the stroller had been hit by a truck, she was hurt and bleeding, and her grandson was nowhere to be seen.

Accordingly, for the reasons stated above, I conclude that the Supreme Court correctly denied that branch of the appellants' motion which was for summary judgment dismissing the third cause of action in the complaint interposed in the action originally commenced under index No. 25874/98 insofar as asserted against them.